UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | Case No. 2:14-cr-00306-LDG-NJK |
| ) | |
| vs. ) | REPORT &  RECOMMENDATION |
| ) | |
| RICHARD WILLIAM WARD, ) | (Docket No. 37) |
| Defendant. ) | |

This matter was referred to the undersigned Magistrate Judge on Defendant Richard William Ward's Motion to Suppress Evidence.  Docket No. 37.  On January 21-22, 2015, the Court held an evidentiary hearing on Defendant's motion.  Docket Nos. 64, 66.  After the evidentiary hearing ended, the Court ordered supplemental briefing.  On August 3, 2015, the Court held a continued evidentiary hearing, after which both parties made oral argument to the Court.  Docket No. 131.  The Court has considered Defendant's Motion, the United States' Response, Defendant's Reply, the evidence adduced at the original evidentiary hearing on this matter, the parties' supplemental briefing, the supplemental evidentiary hearing, and the parties' arguments.  Docket Nos. 37, 54, 58, 64, 66, 71, 73, 116, 118, 121, 122, 130, 131.

## I.      BACKGROUND AND PROCEDURAL HISTORY

### A.      Testimony of Sergeant McKenzie

On May 26, 2014, at approximately 2:25 p.m., Las Vegas Metropolitan Police Department ("LVPMD") Sergeant ("Sgt.") Kurt McKenzie, while on duty in uniform and a marked patrol car, a tone alert came over his police radio and also popped up on his computer screen, for the 4600 block of Supreme Court.  Docket No. 119 at 6-7, 47.  Although the CAD report (a report generated by the radio traffic between dispatch and the officers in the field) gave the call address as 4601

1    Supreme Court, Sgt. McKenzie did not remember the exact number of the address. *Id*. at 40, 43, 47.[1]

2    *See* Exhibit 503.  Sgt. McKenzie explained that a tone alert is a high priority call over dispatch that

3    has a weird noise and gets his attention. *Id*. at 7.  Sgt. McKenzie recalled that the call was for shots

4    fired, multiple people involved, as a result of a fight. *Id*. at 7, 45.  As a supervisor, Sgt. McKenzie

5    usually responds to high priority calls such as this one, though he was not specifically assigned to

6    this call. *Id*. at 7, 103-104.  When he arrived at the location, he advised dispatch of his arrival to the

7    scene of the call. *Id*. at 104.

8            When he heard the call was for shots fired, Sgt. McKenzie began to formulate a plan as he

9    headed toward the location. *Id*. at 46.  He did not recall that the call mentioned multiple people, or

10   that the call mentioned black male adults or Hispanic male adults. *Id*.  Instead, he focused on the

11   fact that the call was for shots fired, which meant a gun was involved. *Id*. at 100.  He focused on that

12   aspect of the call because guns kill people. *Id*.

13           Sgt. McKenzie was familiar with the block of Supreme Court mentioned in the tone alert,

14   as it was within his area of responsibility. *Id*. at 7-8.  Additionally, he had responded to a call on that

15   block a week before the instant tone alert. *Id*. at 8.  When he received the tone alert in the instant

16   case, Sgt. McKenzie was not far from Supreme Court, and arrived at the location within three to four

17   minutes. *Id*. at 9.  Since the call was for shots fired, Sgt. McKenzie parked his car on the street that

18   leads into Supreme Court, which is a cul-de-sac, rather than turning into Supreme Court itself. *Id*..

19   Sgt. McKenzie did so because it was safer, and he would not be stuck on the cul-de-sac with

20   nowhere to escape in case Supreme Court was dangerous. *Id*. at 10.

21           Sgt. McKenzie was the first officer to arrive on the scene. *Id*.  He parked his vehicle and, as

22   soon as he started walking toward Supreme Court, a woman ran toward him, talking. *Id*. at 10-11,

23   61.  She made contact with him, as opposed to him making contact with her. *Id*. at 101.  This

24   woman was the only person that Sgt. McKenzie saw outside at that point. *Id*. at 12.  The woman was

25   "pumped up ... she wasn't calm ... she was excited." *Id*. at 101. When the woman ran up to Sgt.

26   McKenzie, he thought she was the person who had called 911. *Id*.  Sgt. McKenzie told the woman

27   _____

28   [1]Sgt. McKenzie never heard the underlying 911 call, he simply received the information over
     dispatch. *Id*. at 99-100.

to calm down, and she pointed toward a vehicle in front of a residence at 4613 Supreme Court about 25 to 30 feet from Sgt. McKenzie and said, "That's them, that's them.  There they are."  *Id*. at 11, 13, 51, 61, 150.  Sgt. McKenzie looked where the woman pointed, saw a male reaching inside the vehicle, and began to head toward it.  *Id*. at 11, 15.  At the same time, Sgt. McKenzie asked for a Code Red - which locks down the radio channel so that he is the only person who can use it - over the radio.  *Id*. at 11.  Despite his request, Sgt. McKenzie did not initially get the Code Red, either because of radio problems that day or because Dispatch did not hear his request.  *Id*.[2]  Nonetheless, Sgt. McKenzie continued approaching the vehicle, and drew his gun.  *Id*.  He saw one male leaning into the vehicle, a second male on the walkway by the house where the vehicle was parked, and a third male at the door of the house.  *Id*. at 11-12.

Sgt. McKenzie was still the only officer on the scene when he made contact with the three males.  *Id*. at 14.  As he approached, he observed Defendant Richard William Ward, who was standing outside the rear driver's side door, reach inside the vehicle, across the seat as if he were picking something up.  *Id*. at 14, 62-63.  Sgt. McKenzie could not see Defendant's hands or what he was reaching for at that time.  *Id*. at 15.  He could see Defendant's legs and feet, but could not see his hands or head.  *Id*.  As Sgt. McKenzie approached the residence, he began giving commands to Defendant and the other individuals.  He told Defendant to get out of the car and show his hands.  *Id*. at 16, 63, 69.  Additionally, Sgt. McKenzie told Bruce Howard, the male who was on the walkway between the vehicle and the front door of the residence, to get to the ground, which he immediately did.  *Id*. at 15, 17, 64.  Defendant, however, did not immediately comply with Sgt. McKenzie's commands.  Instead, he took "a little bit of time" to get out of the car before obeying Sgt. McKenzie's commands, and Sgt. McKenzie could not tell what Defendant was doing in the vehicle.  *Id*. at 16-17.  Defendant reached into the vehicle, then turned around toward Sgt. McKenzie and threw something to the ground.  *Id*. at 17, 69.  After throwing the item to the ground, Defendant

---

[2]Sgt. McKenzie requested a Code Red three times during this incident.  *Id*. at 20; Docket No. 120 at 149.  He testified that the radio system in use at the time by LVMPD never worked correctly.  Docket No. 119 at 104-105.  The problems included calls not going through and, eventually, LVMPD replaced the system with new radios.  *Id*.  A code red must be activated by the dispatcher, not by the officer requesting it.  Docket No. 120 at 130, 132.

1  put his hands up. *Id*. at 71.  He then continued to follow Sgt. McKenzie's commands, and eventually

2  got onto the ground on his stomach, where he was handcuffed by two officers. *Id*.  Officers later

3  determined that what Defendant threw was a weapon - an arrow head with threads on it that can be

4  screwed into a broomstick or other object. *Id*. at 35.

5         In the meantime, the third male - Dearing - was standing in the doorway of the residence.

6  *Id*. at 67.  He was holding his hands against his body between his stomach and his chest, with his

7  hands facing his stomach area. *Id*. at 17-18.  When Dearing saw Sgt. McKenzie and heard his

8  commands, he pivoted away from the officer "like he was trying to disguise whatever he was

9  holding." *Id*. at 18.  Dearing then disappeared through the door of the residence. *Id*.  Dearing's

10 movements were very deliberate and reminded Sgt. McKenzie of the way officers hold their firearms

11 while at the shooting range. *Id*.  He believed that Dearing's movements were consistent with holding

12 a firearm, which concerned him. *Id*.  Once Dearing went inside the residence, Sgt. McKenzie could

13 no longer see him, as he could not see inside the residence. *Id*. at 19-20.

14        At about this time, other officers arrived on the scene and detained Defendant and Howard.

15 *Id*. at 18, 20-21, 37-38.  Sgt. McKenzie spoke with both of them, but both claimed to know nothing.

16 "They couldn't tell me each other's name.  They couldn't tell me who lives there.  They couldn't tell

17 me who owns the house.  They couldn't tell me anything." *Id*. at 21.  Sgt. McKenzie testified that

18 he did not see a gun on Defendant, Howard, or Dearing. *Id*. at 70.

19        Officers set up a perimeter around the house, completely surrounding it. *Id*.  At this time,

20 Sgt. McKenzie knew Dearing was in the house, and was trying to figure out why he did not want to

21 come out when law enforcement repeatedly asked him to do so over the bull horn. *Id*. at 20-21.

22 After some period of time, the door of the residence opened and a female, later identified as Amber

23 Martinez, came outside. *Id*. at 21.[3]  At that point, Defendant told him no one else was inside, which

24 Sgt. McKenzie knew was not true because he had observed Dearing go inside. *Id*. at 22.  Sgt.

25 McKenzie testified that it was alarming to him because he knew that at least one person was still

26

27         [3]Officers detained Martinez and questioned her to try to determine who was inside the house
   and if there was anything dangerous inside. *Id*. at 23, 37-38.  She was, however, "high as a kite,"
28 and could not give any information. *Id*. at 23

1   inside the residence.  *Id*. at 22-24.

2          A short time after the female came outside, Dearing exited the residence, and was detained.

3   *Id*. at 24, 37-38.  Sgt McKenzie asked him if anyone else was still inside the house, and he said no.

4   *Id*.  Sgt. McKenzie then went to Defendant, told him that two males and a female had come out of

5   the house, and asked him if there was anyone else inside.  Defendant said no.  *Id*.  Sgt. McKenzie

6   told Defendant he needed to tell him if anyone else was still in the house because officers were going

7   to send a dog inside.  *Id*. at 24-25.  Sgt. McKenzie testified that officers planned to send a dog into

8   the house because the call was for shots fired, and they did not know if someone was injured inside

9   the house.  *Id*. at 25.  Defendant then said that there was a dog in the house and, at this point, started

10  to answer a few more of the officers' questions.  *Id*.  Since a dog was loose inside the house, officers

11  could not send a K9 dog inside, and instead continued to challenge the house, asking for everyone

12  inside to come out.  *Id*.

13         When no one came outside, and the canine officer on the scene would not send his dog in,

14  officers decided to do a protective sweep - or a welfare sweep - of the house "to see if there's

15  anybody injured in the house or if there's anyone else in the house."  *Id*. at 25-26, 106.  Sgt.

16  McKenzie testified that he was concerned someone else may be in the house or someone may be

17  injured for several reasons: "The original nature of the call was a gun call.  The way [Dearing] closed

18  the door when he was advised to step out and come towards me and the nature of ... the surrounding

19  area with  ... the gun – with the spent shell casings all over."  *Id*. at 106.

20         Prior to entering the residence, Sgt. McKenzie had noticed, in walking toward the front door,

21  that the walkway leading to the door was "littered" with spent ammo casings.  *Id*. at 27.  Sgt.

22  McKenzie testified, "you know how most people have grass?  They had shell casings out front.

23  There was [sic] that many."  *Id*.  Eight officers entered the house to conduct the protective sweep.

24  Four cleared the first floor, and four cleared the second floor.  *Id*. at 26.  Sgt. McKenzie supervised

25  the team that conducted the protective sweep.  *Id*. at 29.  He stood downstairs near the side doors of

26  the house so that "no one could come from behind the officers and surprise them if there was

27  someone there."  *Id*. at 106-107.  During this first sweep, Sgt. McKenzie did not go upstairs.  *Id*. at

28  107.  The officers conducting the sweep were checking to see if anyone else was inside, or if anyone

1    was hurt. *Id*. at 27.  On the second floor, one room had a locked door.  Also, one room clearly

2    belonged to a child. *Id*. at 28-29.  Sgt. McKenzie went to Defendant and asked him again if anyone

3    was inside the house, because he was concerned that a child or children may be inside. *Id*. at 29.[4]

4    At this point, Defendant had admitted that he lived at the residence. *Id*.  Defendant stated that no

5    one was inside, but Sgt. McKenzie noted that Defendant had said that earlier when two people were

6    inside the house. *Id*.

7        The protective sweep took only a few minutes and, during the sweep, nothing was touched,

8    moved or manipulated. *Id*. at 31.  The officers conducting the protective sweep informed Sgt.

9    McKenzie that "there were guns everywhere in the house ... there were guns on tables.  There were

10   guns on the wall.  There were guns everywhere in the house and [the officers] also found ... a

11   boatload of controlled substances ... inside the residence." *Id*. at 29-30.  Also, officers found a

12   machine shop inside the garage. *Id*. at 30.  At first, Sgt. McKenzie thought the machine shop was

13   not unusual, but then he saw cylinders, and some officers who were in the military told him they

14   were suppressors. *Id*.  Sgt. McKenzie noted that there were numerous guns with suppressors on

15   them in the garage. *Id*.

16       After noticing the guns, officers notified LVMPD's firearms detail. *Id*. at 31.  Officers froze

17   the residence, and then conducted a walkthrough with the firearms detective, Detective Kitchen,

18   when he arrived to show him what they had seen inside, so that he could obtain a search warrant.

19   *Id*. at 31, 84, 96-97.[5]  During this walkthrough, officers saw nothing that they had not already seen

20   during the protective sweep. *Id*. at 33.  Sgt. McKenzie recorded the walkthrough on a body camera,

21   which was played in court. *Id*. at 34, 83, 85, 96. *See also* Exh. 518.

22       **B.     Initial Testimony of Detective Kitchen**

23       On May 26, 2014, LVMPD Detective Michael Kitchen was called in his capacity as a

24   Firearms Investigation Section ("Firearms") Detective to respond and assist in the investigation of

25

26       [4]Sgt. McKenzie also asked Defendant if he had keys to the locked room, and Defendant told
     him to kick the door in. *Id*. at 81.

27

28       [5]Sgt. McKenzie was not present during the eventual execution of the search warrant at the
     residence. *Id*. at 108.

what he termed an illegal shooting of a handgun at 4613 Supreme Court. *Id*. at 112-113; Docket No. 120 at 25-26, 52.[6]  Once he arrived at 4613 Supreme Court, Detective Kitchen was in charge of the investigation. *Id*. at 9, 28.  He was told that officers were investigating an illegal shooting that occurred in front of the residence, and that several firearms were inside the residence.  Docket No. 119 at 114.  Detective Kitchen testified that he was the first person from his unit to arrive on the scene (it does, however, appear from the CAD report as if two other firearms officers arrived within a minute or two of Detective Kitchen), and he was briefed by another officer upon his arrival.  *Id*. at 115-116, 146-147; Docket No. 120 at 23-24.[7]  Detective Kitchen was given information on Defendant, Howard, Dearing, and Amber Martinez, as well as information about the protective sweep officers had conducted. Docket No. 119 at 117; Docket No. 120 at 29.  Detective Kitchen was also given the name of Ernestine Oider[8], whom he was told was one of the people who had called about the illegal shooting.  Docket No. 119 at 117.  Detective Kitchen sent LVMPD Firearms Detective Bien to speak with Ms. Oider, and she identified Dearing as the person who had the gun both before and after the shots were fired.  *Id*., at 118-119, 145; Docket No. 120 at 51.[9]  Detective Kitchen also assigned other firearms detectives to conduct interviews with Defendant, Howard and Martinez.  Docket No. 119 at 119.

Detective Kitchen testified that he conducted a walkthrough of the residence because he had been given information that the garage contained equipment used to manufacture suppressors.  *Id*. Firearms detectives do not run across this type of thing very often, and Detective Kitchen knew that

---

[6]Dispatch does not contact Firearms detectives with assignments; rather, Detective Kitchen learns of assignments such as this one when other officers call him from their personal or work cell phones.  *Id*. at 59-60.  Detective Kitchen then contacts Dispatch, as he did in this instance, to state that he is en route to the location.  *Id*. at 60.

[7]Detective Kitchen testified that, when he arrives at a scene, he generally begins talking to other officers and gathering information, rather than notifying Dispatch of his arrival.  Docket No. 120 at 61.  The arrival notations on the CAD report are not automatic, and he speculated that someone from Firearms who was not busy gathering information may have called Dispatch and marked all of the Firearms Detectives as having arrived at the same time.  *Id*. at 61-62.  He testified that this is routine practice in the Firearms section.  *Id*. at 62.

[8]This witness was also referred to as Ernestine Boudier.  Docket No. 120 at 31, 35, 37.

[9]Ms. Oider (or Boudier), who lived on the block, was afraid of retaliation and refused to give a formal statement to the police.  Docket No. 119 at 144-145; Docket No. 120 at 31, 35, 37.

patrol officers do not run across it very often, either, so he wanted to confirm that what the officers saw was, in fact, "a garage that was converted into manufacturing illegal firearms." *Id*. *See also* Docket No. 120 at 14 (purpose of walkthrough was so Kitchen could verify that the officers saw what they thought they saw). Prior to the walkthrough, officers had told Detective Kitchen that firearms were mounted on the wall, lying on tables, and in glass cases inside the residence. Docket No. 119 at 119-120. Officers had also told Detective Kitchen that they observed narcotics inside the residence. *Id*. at 120.

During the walkthrough, Detective Kitchen observed firearms in the kitchen, firearms mounted on a rack on the wall near the garage, and machines with firearms beneath them in the garage. *Id*. Some of these firearms had suppressors mounted on them, and Detective Kitchen also observed boxes of what appeared to be suppressors, though he did not know if they were fully functional or finished. *Id*. Detective Kitchen testified that he was, at this time, gathering information to establish probable cause to obtain a search warrant for the residence. *Id*.

During this time, Detective Kitchen learned from other officers that Defendant, Howard and Dearing were in front of the residence when officers arrived, and that officers issued verbal commands. *Id*., at 120-121. Defendant and Howard complied with the commands, while Dearing, who had an unknown object in his hand, ran inside the residence and closed the door behind him. *Id*. at 121; Docket No. 120 at 28. Detective Kitchen was told that officers surrounded the residence and issued verbal commands for Dearing to come outside, and that both Dearing and Martinez exited the residence. Docket No. 119 at 121. Detective Kitchen was also told by other officers that all four subjects lived at the residence and that Howard was a convicted felon. *Id*.; Docket No. 120 at 53.

Based on the information given to him by the other officers, as well as his own observations, Detective Kitchen believed he had probable cause for a search warrant for the residence. Docket No. 119 at 122. He therefore began drafting the telephonic search warrant affidavit, while other officers were still conducting interviews with Defendant, Howard, Dearing and Martinez, and did not use any of the information obtained in those interviews in his affidavit. *Id*. at 122, 145. Detective Kitchen applied for a telephonic search warrant rather than a written one because he and numerous officers were already on the scene and a telephonic search warrant could be issued much faster than a written

search warrant. *Id*. at 123. Detective Kitchen included all the information he believed was necessary for probable cause into the search warrant affidavit. *Id*. Detective Kitchen did not listen to the 911 call in putting the affidavit together, which is common practice. Docket No. 120 at 64. Rather, he finds that the first responders have the most updated and relevant information. *Id*.[10] Once he put the information together for the affidavit, he had to have it approved by his supervisor.[11] Docket No. 119 at 123. After Detective Kitchen's supervisor approved the affidavit, he called the district attorney for approval. *Id*.; Docket No. 120 at 14. Finally, at approximately 4:39 p.m., he called the on-call judge to issue the telephonic search warrant.[12] Docket No. 119 at 123-124; Docket No. 120 at 13. In this instance, Detective Kitchen went through all three steps of approval. Docket No. 119 at 124; Exhibit 513. During the time he has been with firearms, Detective Kitchen has obtained approximately 50 to 60 search warrants, the vast majority of which are telephonic. Docket No. 120 at 17.

The search warrant was for the location of 4613 Supreme Court. *Id*. at 32. The affidavit included information that Detective Kitchen received from other officers, including that the original call came from 4605 Supreme Court. *Id*. at 32, 37. The affidavit stated that Defendant and Howard were in the front yard of the residence, and that Dearing was observed in the front of the residence with an unknown object in his hand before he ran inside the residence. *Id*. at 38.[13] The affidavit further stated that all four people - Defendant, Howard, Dearing and Martinez - were residents of the house. *Id*. at 39, 53. Detective Kitchen also included information about people who were prohibited

---

[10]In any event, in order to listen to the 911 call, Detective Kitchen would have had to submit a request through his chain of command to Dispatch, and would not receive an audio copy of the call for several days. Docket No. 120 at 65.

[11]Detective Kitchen used a template and notes to organize all the aspects of probable cause for the affidavit. Docket No. 120 at 15. After he wrote the warrant application and his arrest report, Detective Kitchen shredded his notes. *Id*. at 30. He did so because "all of our files then become electronic and we don't keep any loose papers." *Id*.

[12]The entire phone call with the judge was recorded and later transcribed. Docket No. 120 at 14-15.

[13]Detective Kitchen mistakenly referred to Defendant as Howard, rather than Ward, one time out of three in the affidavit. Docket No. 120 at 67-68. He testified that this mistake was inadvertent. *Id*. at 68, 75. Detective Kitchen also testified that this was the only mistake he noted in reviewing the affidavit. *Id*. at 75.

1   from having guns because he had information from another officer that Howard was a convicted

2   felon.  *Id*. at 40-41.  Detective Kitchen included information about the protective sweep that was

3   conducted by officers, and that the officers observed firearms, including long rifles, assault rifles and

4   silencers inside the residence and a workshop in the garage where sound suppressors and silencers

5   were being manufactured.  Docket No. 37-2 at 5.  The affidavit does not, however, contain any

6   information regarding the second walkthrough.  *See* Docket No. 37-2.  Although Detective Kitchen

7   swore that the information in the affidavit was true and correct to the best of his knowledge, he did

8   not inform the judge that the information in the affidavit came from a secondary source - other

9   officers.   Docket No. 120 at 76.

10        Once the judge approved the search warrant, Detective Kitchen and his team took

11   photographs inside the residence "to document everything that was found in its original location."

12   Docket No. 119 at 124.  The officers then broke up into teams in order to document and impound

13   all items in the search warrant.  *Id*.  During the search, officers recovered approximately 78 firearms,

14   and "quite a bit of narcotics."  *Id*. at 125, 136.  Officers had learned during the interviews that there

15   were booby traps inside the residence, as well as a possible secret passage under the cabinets in the

16   kitchen.  *Id*. at 125.  As a result, they had Defendant walk them through the house to point out the

17   booby traps and the hidden door that led to the secret room under the stairs, so that no one would get

18   hurt.  *Id*.[14]

19        On June 9, 2014, Detective Kitchen and Detective Hodson interviewed Martinez at the Clark

20   County Detention Center.  *Id*. at 128, 141.  At this time, Detective Kitchen knew that Martinez was

21   a paid informant for the ATF.  *Id*. at 141; Docket No. 120 at 71.[15]  During this interview, Martinez

22   told the detectives that she had been staying at the residence.  Docket No. 119 at 129.  She stated that

23   she had seen Defendant and Dearing inside the garage working on firearms and possibly making

24

25        [14]Hypodermic needles were scattered through the house, taped to walls and lying around.

26   Also, small animal traps were located in the dresser drawers between clothes.  *Id*. at 126.

27        [15]The parties marked the audio recording of the interview Government Exhibit One and it
was admitted into evidence for the purpose of the Court determining whether or not Martinez was

28   under the influence of any sort of intoxicant at the time of the interview, based on her demeanor and
responsiveness during the interview.  Docket No. 120 at 77.

1   suppressors for firearms.  *Id*.  Martinez also told the detectives that Defendant and Dearing spoke

2   about burying body parts in the backyard, and keeping fingertips as keepsakes.  *Id*.  Based upon this

3   interview, the original search warrant, investigation and follow-up investigation,[16] Detective Kitchen

4   drafted a second search warrant for the residence for human remains.  *Id*. at 129-130.  Detective

5   Kitchen also included in the second search warrant two smoke grenades, fused wire and a mercury

6   bottle that he believed had been overlooked during the execution of the original search warrant.  *Id*.

7   at 130.

8          Due to the nature of the information received, including weapons, body parts and booby

9   traps, SWAT made entry on the second search warrant.  *Id*. at 131-132.  Upon entry, SWAT

10  discovered that the residence had been completely cleaned out and the actual owners of the residence

11  had started remodeling it.  *Id*. at 132.  Officers dug up the backyard and found nothing.  *Id*.  Nothing

12  was recovered from inside the residence, either.  *Id*.  Approximately a day later, the owners of the

13  residence contacted Detective Kitchen and told him that they had cleaned out the residence and were

14  storing everything they had removed from the residence in their storage facility.  *Id*.  Detective

15  Kitchen met with the owners, who told him they had leased the property to Defendant, and showed

16  him the lease agreement, which indicated that Defendant was in control of the property at the time

17  of the initial search warrant.  *Id*.  Further, the owners gave Detective Kitchen entry to the storage

18  facility where they stored items they had removed from the residence, including two smoke grenades,

19  large caliber ammunition, and mercury.  *Id*. at 132-133, 137.  LVMPD armor section came out and

20  recovered those items.  *Id*. at 133, 137.

21          **C.   Testimony of Isaura Reyes**

22          On May 26, 2014, at approximately 2:00 p.m., Isaura Reyes was present on the 4000 block

23  of Supreme Court.  Docket No. 120 at 81-82.  Reyes' mother lives at 4608 Supreme Court.  *Id*.

24  Reyes testified that she observed a fight about to break out in the driveway of 4600 Supreme Court

25

26

27

28          [16]The investigation included a statement Detective Kitchen took from Howard on May 26, 2014, as well as the May 26, 2014 statement of Martinez.  Docket No. 120 at 68-69.

and that, after she went back inside either her house or her mother's house,[17] she heard three gunshots. *Id*. at 83-84. Reyes then called 911. *Id*. at 85; Exhibit 516. She told the dispatcher that she needed police to come out because there was a fight breaking out and she had heard gunshots. *Id*. at 85, 88. She testified that she did not give her address to the dispatcher. *Id*. at 86.

### D.    Testimony of Stacey Fason

Stacey Fason is employed by LVMPD as a Dispatch Specialist Two, currently assigned to the research office. She is a Custodian of Records for LVMPD in the Communications Bureau. *Id*. at 100. Fason has also worked as a dispatcher. *Id*. at 124. Fason identified the CAD printout as an LVMPD record. *Id*. at 101; Exhibit 503. The CAD report is coded a 434, which means that the call was an illegal shooting call. *Id*. at 103. The address on the CAD is 4613 Supreme Court. *Id*. at 102. The code and the address could have been entered onto the CAD either at the time of the initial call or later - Fason testified that "anything in this CAD can be changed at any point." *Id*. at 104. Additionally, not all of the radio communications are reflected on the CAD. *Id*. at 147.

The call-taker does not necessarily put all of the information from the call over the radio or into the CAD - Fason testified that the call-taker sometimes will just want to put brief information in to get the call routed quickly. *Id*. at 127. The dispatcher would want to get the address out to officers, as well as the fact that the call is for an illegal shooting, for officer safety. *Id*. at 131. It appears from the CAD that at least two calls came into 911 about the shooting, the first one from 4601 Supreme Court and the second one from 4617 Supreme Court. *Id*. at 128, 131, 143. The dispatcher initially broadcast over the radio that the call came from 4601 Supreme Court, and that the event occurred at the house to the right of the call. *Id*. at 143.

### E.    Further Procedural Occurrences After the Initial Evidentiary Hearing

At the end of the evidentiary hearing, the Court ordered supplemental briefing from the parties regarding the walkthrough that occurred after the protective sweep. *Id*. at 151-153. The

---

[17]Reyes initially testified that she was visiting her mother's home, at 4608 Supreme Court, which is two doors down from 4600 Supreme Court. Exh. 502. *See* Docket No. 120 at 81-82. On cross-examination, she testified that she had once lived at 4601 Supreme Court, but had moved out of that residence in July 2013. *Id*. at 89, 93. She admitted, however, that her driver's license still bears the address of 4601 Supreme Court. *Id*. The recording of the 911 call reveals that she gave her address as 4601 Supreme Court, and stated that she wished to remain anonymous. *Id*. at 90.

1   Court ordered the parties to file supplemental briefing no later than January 30, 2015, and set oral

2   argument on the motion for February 4, 2015.  *Id.* at 153-154.

3          On January 23, 2015, however, the Court became aware of information that Detective

4   Kitchen had been arrested and ordered a telephonic status hearing for later that day.  Docket No. 65.

5   At that hearing, the parties discussed their positions regarding the status of the case in light of the

6   new development.  Docket No. 67.  Additionally, the Court ordered that supplemental briefing

7   regarding the walkthrough after the protective sweep, as well as statements of the parties' positions

8   regarding the new development, was due no later than January 30, 2015.  *Id.*  The Court further

9   ordered that any additional briefing deemed necessary was due no later than February 4, 2015;

10  responses were due no later than February 11, 2015; and replies were due no later than February 17,

11  2015.  *Id.*  Finally, the Court tentatively continued the oral arguments on the motion to suppress to

12  February 5, 2015.  *Id.*

13         On January 30, 2015, both Defendant and the United States filed their supplemental briefing.

14  Docket Nos. 71, 73.  Defendant argues that neither the protective sweep nor the walkthrough was

15  justified under any exception to the warrant requirement.  Docket No. 71 at 5-6, 9.  He submits that

16  no exigency existed for the protective sweep, as Sgt. McKenzie did not have probable cause to

17  believe that the shots had been fired either from or at his residence.  *Id.* at 6.  Further, Defendant

18  asserts that Dearing's actions were not sufficiently indicative of any crime such as to give rise to

19  exigency.  *Id.* at 7.

20         Finally, Defendant calls into question Detective Kitchen's truthfulness - both in the affidavit

21  and during the evidentiary hearing.  *Id.* at 10.  Defendant notes that, less than two hours after leaving

22  the witness stand before this Court, Detective Kitchen was being investigated by LVMPD for

23  robbery, attempted sexual assault and battery.[18]  *Id.*  Defendant further submits that the public reports

24  _____

25         [18]Defendant points out that the allegations against Detective Kitchen, as had been publicly
    reported, were that he made arrangements to meet the victim for sex through a website prior to
    arriving at her home.  *Id.* at 10.  "Detective Kitchen became upset about the fee the victim requested

26  for her services and physically assaulted her to retrieve the $100.00 he already paid her."  *Id.*  As a
    result, the victim allegedly suffered a broken wrist and scratches to her breast area.  *Id.*  Further, the

27  victim "reported to LVMPD that Detective Kitchen argued with her, shoved her, and attempted to
    rip off her clothes while holding her down and hitting her in the face.  The victim was hospitalized

28  for her injuries."  *Id.*

1   state that Detective Kitchen "was observed changing his license plate in an attempt to cover up his

2   crimes," but that LVMPD was nonetheless able to connect Detective Kitchen due to witnesses and

3   surveillance video.  *Id*.  Detective Kitchen had been placed under arrest, and was in custody at the

4   Clark County Detention Center at the time Defendant filed his supplemental brief.  *Id*.  Defendant

5   submits that, considering the information omitted from the search warrant and Detective Kitchen's

6   credibility, this Court should find that Detective Kitchen exercised reckless disregard for the truth

7   in writing his affidavit.  *Id*. at 12.  Defendant  asks this Court to carefully consider Detective

8   Kitchen's veracity in light of all the circumstances, and to grant his motion to suppress.  *Id*. at 13.

9       The United States submits that no Fourth Amendment violations occurred in this case, and

10   that Detective Kitchen's subsequent criminal arrest and the underlying information regarding his

11   arrest are irrelevant to the instant case.  *See* Docket No. 73.  The United States argues that the

12   protective sweep was proper, and that the subsequent walkthrough was completed in order for Sgt.

13   McKenzie to verify information provided to him by the LVMPD officers he was supervising, and

14   for Detective Kitchen to verify information to support his search warrant application.  *Id*. at 3.  The

15   United States submits that the firearms were found in plain view inside the residence, that probable

16   cause existed to support a search warrant for the residence prior to the brief walkthrough, and that

17   no new or additional evidence was gathered during the walkthrough that had not already been seen

18   during the protective sweep; therefore, no prejudice occurred to Defendant.  *Id*. at 3, 5.

19       Additionally, the United States contends that any criminal activity committed by Detective

20   Kitchen after the evidentiary hearing is irrelevant and inadmissible extrinsic evidence for

21   impeachment purposes, as the information does not go to the truthfulness of his search warrant

22   affidavit or his testimony at the evidentiary hearing.  *Id*. at 6; FRE 608(b).  The United States

23   submits that it has no objection to reopening the evidentiary hearing for the sole purpose of allowing

24   the Court to consider Detective Kitchen's arrest, but argues that anything beyond that is improper.

25   *Id*. at 7.  The United States asks the Court to deny Defendant's motion to suppress.  *Id*. at 8.

26       Also on January 30, 2015, Defendant filed a motion to compel discovery.  Docket No. 72.

27   Defendant asked the Court to order the preservation of any cellular telephone records, as well as the

28   phones themselves, for any and all cellular telephones issued to or used by Detective Kitchen on

1    January 22, 2015; and the arrest report for Detective Kitchen's arrest.  *Id*. at 3.  Defendant also asked

2    the Court to conduct an *in camera* review of both Detective Kitchen's personnel file and any police

3    file dealing with an investigation by Internal Affairs into the conduct of Detective Kitchen.  *Id*.  In

4    response, the United States submitted that it has followed all of its discovery obligations, and asked

5    the Court to deny Defendant's motion.  *See* Docket No. 75.  The Court granted Defendant's motion

6    in part and denied it in part.  *See* Docket No. 77.  The Court ordered the United States to produce

7    Detective Kitchen's personnel files and any Internal Affairs investigation of Detective Kitchen to

8    the Court's chambers for *in camera* review no later than February 23, 2015.  *Id*. at 4.

9         In reviewing certain documents that were produced in chambers in response to the Court's

10   order, the Court found that they were not exculpatory and not material to preparing the defense in

11   the instant case.  Docket No. 78 at 1.  The Court found, however, that documents regarding the

12   investigation of the incident that lead to Detective Kitchen's arrest had not been produced to

13   chambers, and ordered them produced for *in camera* review no later than March 4, 2015.  *Id*. at 1-2.

14   On March 5, 2015, after the United States failed to comply with the Court's February 25, 2015,

15   order, the Court set a hearing for that afternoon.  Docket No. 80.  The Court stated that the March

16   4, 2015, deadline had passed, "and the Court has not received the subject documents, any statement

17   regarding the basis for LVMPD's objections to the *in camera* review of those documents, or any

18   other response of any kind from either the Government or LVMPD."  *Id*., at 2.

19        At the March 5, 2015, hearing, the United States admitted that it had received the Court's

20   February 25, 2015, order and accepted responsibility for having failed to comply with it, stating that

21   the failure was inadvertent.  The United States further represented to the Court that the Court does

22   not have the authority to compel an *in camera* production of documents in LVMPD's possession.

23   The Court allowed the United States an opportunity to brief that issue and, if the Court does not have

24   such authority, how the Court should determine the credibility of Detective Kitchen's testimony in

25   light of the current record.  The Court ordered the United States to file its brief no later than March

26   16, 2015, and also set  response and reply dates.  Docket No. 81.

27        On March 16, 2015, the United States filed a Motion for Magistrate Judge to Reconsider

28   Magistrate Judge Order.  Docket No. 83.  On March 23, 2015, the Court denied the United States'

1    motion because it failed to address the standards for reconsideration. Docket No. 87. The Court also

2    noted that the motion simply rehashed the arguments the United States had already made and the

3    Court had already rejected. *Id.*, at 1. Further, the motion failed to address the specific items the

4    United States had represented at the March 5, 2015, hearing that it wanted to brief. *Id.*, at 1-2. The

5    Court allowed the United States one final opportunity to address these issues. *Id.*, at 2.[19]

6         On March 30, 2015, the United States filed a second Motion for Magistrate Judge to

7    Reconsider Magistrate Judge Order. Docket No. 91. On April 2, 2015, Defendant filed his response

8    to the United States' motion. Docket No. 94. The United States did not reply. *See* Docket.

9    Additionally, on April 2, 2015, Defendant filed a Motion for 17(c) Subpoena. Docket No. 93. On

10   April 6, 2015, the United States filed its response to Defendant's motion. Docket No. 97. The Court

11   denied the United States' motion to reconsider, and ordered the relevant records produced to

12   chambers no later than April 13, 2015. Docket No. 99. The Court also granted Defendant's motion

13   for a Rule 17(c) subpoena. *Id.*

14        Eventually, after all documents had been produced to the Court and the Court had conducted

15   an *in camera* review of them, the Court issued an order regarding its review and production to

16   Defendant. Docket No. 107. The Court ordered LVMPD to produce to the United States Detective

17   Kitchen's January 23, 2015, interview with LVMPD Detectives Taylor and Pretti (both the audio and

18   the written transcript) and the search warrant affidavit for Detective Kitchen's cellular phones. *Id.*

19   at 2. The Court further ordered the United States to produce these items to Defendant. *Id.* The

20   Court then set a briefing schedule for any arguments that may arise out of the information in the

21   items produced. *Id.* Finally, the Court set oral argument on the motion to suppress and any

22   supplemental briefing for May 26, 2015. *Id.*

23        On May 14, 2015, Defendant filed a supplemental pleading requesting the Court to reopen

24   the evidentiary hearing so that he could recall Detective Kitchen for impeachment purposes. *See*

25   Docket No. 116. Defendant submitted that Detective Kitchen's credibility is central to his motion

26

27        [19]Immediately after the Court's order on the docket (and presumably filed before Defendant
     knew of the Court's order), Defendant filed a response to the United States' motion accusing the
28   United States of delay tactics. Docket No. 88. Defendant asked the Court to grant his motion to
     suppress on any or all of the alternative grounds he had presented. *Id.* at 2.

to suppress.  *Id*. at 10.  Defendant argued that the documents produced by LVMPD contain information that "bears directly on Detective Kitchen's credibility, bias, intent, and motivation to give untruthful testimony."  *Id*. at 5.  Defendant cited, in particular, Detective Kitchen's statements during the interview (which Defendant characterized as false), as well as Defendant's contention that Detective Kitchen destroyed evidence relative to his crime, and Defendant's submission that "Detective Kitchen is clearly biased against those he considers criminal."  *Id*. at 7-9.

The United States, in response, argued that recalling Detective Kitchen solely for impeachment was improper, and would place undue emphasis on the new information.  Docket No. 118 at 2-3.  The United States further submitted that Defendant's request was untimely made, as it came several months after the evidentiary hearing.  *Id*. at 4.  Additionally, the United States contended that the information Defendant sought to elicit from Detective Kitchen was improper and impermissible under F.R.E. 401, 403, and 608(b).  *Id*. at 5-9.  Finally, the United States anticipated that, if recalled, Detective Kitchen would exercise his Fifth Amendment privilege since his criminal case was still open at that time.  *Id*. at 6.  Defendant replied to the United States' response.  *See* Docket No. 121.

On May 26, 2015, the Court held a hearing on Defendant's sealed supplement.  Docket No. 122.  After hearing arguments of counsel, the Court granted Defendant's request to reopen the evidentiary hearing for the purpose of calling Detective Kitchen to testify.  *Id*.  The Court set the continued evidentiary hearing for June 25, 2015.  *Id*.  On June 25, 2015, at the parties' joint request, the Court continued the evidentiary hearing and oral arguments to August 3, 2015.  *Id*.

## F.    Continued Testimony of Detective Kitchen

On August 3, 2015, Detective Kitchen testified that he remembered having testified before the Court on January 22, 2015.  Docket No. 132 at 11.  He testified that, before the day was over, he himself was being questioned for a criminal act.  *Id*.  Detective Kitchen entered into a plea agreement for a gross misdemeanor for attempted theft, and was sentenced to probation not to exceed three years.  *Id*. at 11-12.  If he completes the probation, as part of the plea agreement, his attorney will petition the Court to reduce his conviction to a single misdemeanor.  *Id*. at 12.  The crime to which Detective Kitchen entered his guilty plea was reduced from the crime with which he was

originally charged. *Id.*

Shortly after completing his testimony before this Court on January 22, 2015, Detective Kitchen contacted a person online for the purpose of receiving a body massage. *Id.* at 12-13. Detective Kitchen had used this online method in the past to find young, attractive women to give him body massages. *Id.* at 14. When he arrived at the location, a young woman met him at the door and escorted him into her apartment. *Id.* at 13. Detective Kitchen gave her $100 for the massage. *Id.* at 13-14. The two engaged in a discussion of things that were going to take place - during this discussion, the young woman mentioned condoms, though Detective Kitchen testified that the two did not engage in conversation about condoms. *Id.* at 13. Fairly quickly, the conversation turned into a "business disagreement" and Detective Kitchen insisted that the young  woman return his money, which she refused to do. *Id.* at 14.

Detective Kitchen testified that, as a result of the young woman's refusal to give the money back, the two had a "disagreement," but that the disagreement did not turn physical. *Id.* at 15. He further testified that he got his money back because the young woman willingly handed it back to him. *Id.* at 15-16. He acknowledged, however, that the young woman later claimed that in the dispute over the money her bra was torn, her breast was bruised, and she suffered some contusions around her head. *Id.* at 15. Detective Kitchen testified that he did not inflict the injuries upon the young woman and that, when he left her apartment with his money, she was in the same physical condition as she had been when he arrived. *Id.* at 16.

After Detective Kitchen went past the young woman and exited her apartment, he heard her "yelling and screaming," and saw one male running down the hallway in Detective Kitchen's direction. *Id.* at 16-17. Detective Kitchen jogged away from the individuals, got into his truck, and drove away. *Id.* at 17, 25-26. He testified that, as an LVMPD detective, he did not have an obligation to see if the young woman needed help because she was yelling and screaming out of anger, not out of the need for any medical aid or assistance. *Id.* at 17-18, 36.

At some point after he left the young woman's apartment that night, Detective Kitchen changed the license plates on his truck. *Id.* at 19. He also erased the text messages on his phone between the young woman and him where they set up the meeting and she affirmed that her services

were available. *Id*. at 20.  Detective Kitchen testified that he erased the text messages because his girlfriend would most likely not approve of the fact that he went outside the relationship for a massage, and that he had a practice of erasing text messages that could get him into trouble with his girlfriend. *Id*. at 20-21.

On January 23, 2015, at approximately 2:30 a.m., LVMPD officers came to Detective Kitchen's door to question him about this incident. *Id*. at 23.  He was cooperative, and went to headquarters with them to allow them to interview him. *Id*.  In his interview, Detective Kitchen gave various reasons as to why he uses the specific online site used here and other means to schedule massages. *Id*. at 24.  He also stated that he changed the license plates on his truck because he did not want anyone who knew the young woman to see his truck and to be able to identify him. *Id*. at 24, 37.

Detective Kitchen was originally charged with robbery, battery, and battery with substantial bodily harm because of the young woman's broken wrist.[20] *Id*. at 26.  The attempted theft charge to which he entered an Alford plea was based upon the $100 he took from the young woman. *Id*. at 27-29.  Detective Kitchen acknowledged that evidence existed in his case that could have led to a conviction and stiffer penalty than he received under the plea agreement and that, after discussion with his counsel and family and a weighing of the pros and cons and totality of the circumstances, he determined that the Alford plea into which he entered was his best course of action. *Id*. at 30.

## II.   ANALYSIS

### A.   Credibility of Witnesses

The Court ordered an evidentiary hearing because the facts presented in the parties' briefing contradicted each other.  "The longstanding and repeated invocations in caselaw of the need of district courts to hear live testimony so as to further the accuracy and integrity of the factfinding process are not mere platitudes.   Rather, live testimony is the bedrock of the search for truth in our judicial system." *United States v. Thoms*, 684 F.3d 893, 903 (9th Cir. 2012).  "[J]udges simply cannot decide whether a witness is telling the truth on the basis of a paper record and must observe

---

[20]Detective Kitchen denied that the young woman's wrist was broken. *Id*. at 15.

1    the witnesses' demeanor to best ascertain their veracity - or lack thereof." *Oshodi v. Holder*, 729

2    F.3d 883, 892 (9th Cir. 2013) (internal citation omitted). *See also United States v. Mejia*, 69 F.3d

3    309, 315 (9th Cir. 1995) ("There can be no doubt that seeing a witness testify live assists the finder

4    of fact in evaluating the witness's credibility").

5         During the evidentiary hearing in this matter, the Court had the opportunity to listen to the

6    testimony of all witnesses, to observe and evaluate each witness' demeanor while testifying, and to

7    weigh each witness' credibility. Having done so, the Court finds Sgt. McKenzie entirely credible.

8    During the January hearing, while observing Detective Kitchen testify, the Court found him credible.

9    While the Court noted that Detective Kitchen often had trouble with his memory of the events and

10   relied upon his reports to refresh his recollection, his refreshed recollection was consistent with the

11   testimony of Sgt. McKenzie and the other evidence presented, including the CAD report, regarding

12   the events that occurred on May 26, 2014, thus demonstrating the credibility of his testimony.

13        The Court found Detective Kitchen's August testimony regarding his own criminal arrest and

14   the surrounding events somewhat less credible, as he appeared to slant the facts of that day to make

15   it look as if he did not commit a crime. The Court is troubled by Detective Kitchen's attempts to

16   cover up his activities - including changing his license plate and erasing his text message - and finds

17   that those attempts serve to lessen his credibility. The Court has, however, taken into account that

18   Detective Kitchen's testimony regarding the events of May 26, 2014, comports with Sgt.

19   McKenzie's wholly credible testimony as well as the testimony of Fason and the exhibits presented,

20   and the fact that these events took place approximately eight months prior to the events leading to

21   Detective Kitchen's arrest. The Court therefore finds that those events have no bearing upon the

22   January testimony of Detective Kitchen regarding the events of the instant case and, instead, the

23   Court relies upon its observations of Detective Kitchen on the witness stand as well as the fact that

24   his testimony is consistent with other credible testimony and exhibits.

25        The Court finds Fason entirely credible. Finally, the Court finds Reyes' testimony that she

26   was the first 911 caller, and some of her testimony regarding the events of the day, credible. Where

27   Reyes' testimony contradicts the known evidence such as the CAD report, however, the Court gives

28   more weight to the known evidence.

1

### B. *Franks* Hearing

2       Defendant asks the Court to conduct an evidentiary hearing pursuant to *Franks v. Delaware*,

3 438 U.S. 154 (1978) to determine whether the affidavit submitted in support of the request for the

4 first search warrant was sufficient to establish probable cause. Defendant alleges that the supporting

5 affidavit is deficient because "the affidavit contains material misrepresentations and omissions."

6 Docket No. 37 at 10. Specifically, Defendant alleges that Detective Kitchen knowingly

7 misrepresented facts regarding the 911 call, including the name of the caller, the location from where

8 the call was made, the location reported as the site of the shots fired, and the name of the person

9 firing shots. *Id*. at 12. Additionally, Defendant alleges that Detective Kitchen knowingly

10 misrepresented Defendant's name, as well as whether all four subjects lived in the residence at 4613

11 Supreme Court. *Id*. at 12-13. Finally, Defendant alleges that Detective Kitchen omitted certain

12 information from the affidavit - that the 911 caller was anonymous; that the call indicated that shots

13 were fired by African American or Hispanic individuals at the house directly to the right of 1401

14 Supreme Court, which had a water slide in its driveway; and that the caller indicated she had not

15 seen the firearm. *Id*. at 14-15. Defendant submits that this information is material because

16 Defendant, Howard and Dearing are all Caucasian, which indicates that they were not the ones

17 indicated in the call, and that the officers therefore "had no reason to suspect that anything out of the

18 ordinary or any medical emergency was occurring at 4613." *Id*. at 15.

19       In opposition, the United States contends that Defendant has not made the requisite showing

20 to entitle him to a *Franks* hearing. Docket No. 54 at 15. The United States submits that the

21 statements Detective Kitchen made in the affidavit were based on the facts and evidence he had at

22 the time of the application. *Id*. Further, the United States submits that Defendant has not shown that

23 Detective Kitchen knowingly and intentionally, or with reckless disregard for the truth, made false

24 statements or omissions. *Id*.

25       In reply, Defendant contends that the United States has conceded that he has made the

26 substantial preliminary showing required under *Franks*. Docket No. 58 at 11. Defendant reiterates

27 his position that Detective Kitchen made knowingly false statements about the 911 call, Defendant's

28 name, and who lived in the residence, and knowingly omitted other details. *Id*. at 11-13.

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court addressed at length whether a false statement by a government affiant invalidates a search warrant. *United States v. Hammett*, 236 F.3d 1054, 1058 (9th Cir. 2001) (citation omitted). The Court held that, under certain circumstances, a defendant is entitled to an evidentiary hearing to afford the defendant an opportunity to attack the veracity of a facially-valid affidavit used to support a search warrant. A defendant can challenge a facially valid affidavit by making a substantial preliminary showing that "(1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable cause without the allegedly false information." *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000) (*citing United States v. Stanert,* 762 F.2d 775, 780-81 (9th Cir. 1985)).

Before a criminal defendant is entitled to go beneath the search warrant to obtain additional information concerning the police investigation and an informant, he or she is required to make a substantial threshold showing. A defendant's preliminary showing cannot be "merely conclusionary." *Reeves*, 210 F.3d at 1044. "There must be allegations of deliberate falsehood or reckless disregard for the truth, and these allegations must be accompanied by an offer of proof." *Hammett*, 236 F.3d at 1058 (*quoting Franks*, 438 U.S. at 171). "To justify a hearing, a defendant must make specific allegations, allege a deliberate falsehood or reckless disregard for the truth, and accompany such a claim with a detailed offer of proof." *United States v. Craighead*, 539 F.3d 1073, 1080 (9th Cir. 2008) (citation omitted). The movant bears the burden of proof and must make a substantial showing to support both elements. *See United States v. Garcia–Cruz*, 978 F.2d 537, 540 (9th Cir.1992).

Intentional or reckless omissions may provide grounds for a *Franks* hearing. *United States v. Jawara*, 474 F.3d 565 (9th Cir. 2007)); *see also United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985) ("By reporting less than the total story, an affiant can manipulate the inferences a magistrate [judge] will draw. To allow a magistrate [judge] to be misled in such a manner could denude the probable cause requirement of all real meaning"). Although "[c]lear proof of deliberate or reckless omission is not required," a "[d]efendant 'must offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reason for omitting facts in order to prove

a deliberate falsehood or reckless disregard." *United States v. Souffront*, 338 F.3d 809, 822-23 (7th Cir. 2003). A defendant must also show that the "affidavit, once corrected and supplemented," would not "provide ... a substantial basis for concluding that probable cause existed." *Stanert*, 762 F.2d at 782. "[T]he omission rule does not require an affiant to provide general information about every possible theory, no matter how unlikely, that would controvert the affiant's good-faith belief that probable cause existed for the search." *Craighead* 539 F.3d at 1081.

Before the evidentiary hearing on Defendant's motion began, the Court acknowledged that Defendant had requested a *Franks* hearing. Docket No. 119 at 3. The Court stated that it was not certain at that point whether Defendant had made his substantial preliminary showing to entitle him to a *Franks* hearing, but that the Court had determined that an evidentiary hearing was needed on the motion in any event. *Id*. at 4.

Having heard the evidentiary hearing, the Court finds that Defendant has not made a substantial preliminary showing that the statements or omissions at issue were made either with intent to make the affidavits misleading or with reckless disregard as to whether the affidavits became misleading as a result of them. The Court finds that Detective Kitchen did not knowingly misrepresent facts regarding the 911 call, including the name of the caller, the location from where the call was made, the location reported as the site of the shots fired, and the name of the person firing shots. Although Defendant presented Reyes, who testified that she made the first 911 call, the CAD report clearly shows that a second 911 call was made from a different caller. Sgt. McKenzie testified that he thought the woman who ran up to him on the street was the 911 caller, and the law enforcement investigation found a woman who identified herself as a 911 caller and gave police the information that Detective Kitchen included in the affidavit. Therefore, the Court finds that these facts did not constitute misrepresentations at all.

Additionally, the Court finds that Detective Kitchen did not knowingly misrepresent Defendant's name, or whether all four subjects lived in the residence at 4613 Supreme Court. The testimony is clear that Detective Kitchen made a mistake regarding Defendant's name at one point in the affidavit, but correctly named Defendant in all other parts of the affidavit. Further, Detective Kitchen reasonably believed, from the investigation and from what other officers told him, that all

1    four subjects were connected to the residence.  The Court therefore finds that he did not make these

2    false statements either knowingly or with reckless disregard for the truth.

3           Further, the Court finds that the information Defendant alleged Detective Kitchen omitted

4    from the affidavit - that the 911 caller was anonymous; that the call indicated that shots were fired

5    by African American or Hispanic individuals at the house directly to the right of 1401 Supreme

6    Court, which had a water slide in its driveway; and that the caller indicated she had not seen the

7    firearm - was not omitted knowingly or with reckless disregard for the truth.  Neither Sgt. McKenzie

8    nor Detective Kitchen heard the 911 call, and thus had no information other than what they were told

9    about any of the details of the call.  No information was given to Detective Kitchen regarding the

10   anonymity of Reyes or any of the other information Defendant alleges was omitted.  To the contrary,

11   the other 911 caller identified herself and spoke with law enforcement, and Detective Kitchen

12   included that information in his affidavit.  No evidence has been presented to show that he knew,

13   or should have known, about the information Defendant claims he omitted.

14          The Court had concerns during the hearing about the walkthrough conducted subsequent to

15   the protective sweep, which was not included in the affidavit.  No information was elicited, however,

16   that could lead to a finding that Detective Kitchen omitted this information in order to mislead the

17   judge.  In fact, the affidavit included discussion of the protective sweep, so the judge knew that entry

18   into the residence had been made prior to issuing the warrant, and Sgt. McKenzie testified that no

19   contraband was observed during the walkthrough that had not already been observed during the

20   protective sweep.  Thus, the Court finds that Defendant has failed to meet the first *Franks* prong.

21          Additionally, Defendant has failed to show materiality - that the deletion of the misstatements

22   and the inclusion of the omissions would negate the probable cause in the affidavits.  The probable

23   cause standard for a search warrant is whether, based on common sense considerations, there was

24   "a fair probability that contraband or evidence of a crime [would] be found in a particular place."

25   *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir.1992) (citing *Illinois v. Gates*, 462 U.S. 213,

26   238 (1983)).  The issuing judge need not determine "that the evidence is more likely than not to be

27   found where the search takes place.... The [judge] need only conclude that it would be reasonable

28   to seek the evidence in the place indicated in the affidavit."  *United States v. Ocampo*, 937 F.2d 485,

490 (9th Cir.1991) (citation and internal quotation marks omitted).  Neither certainty nor a preponderance of the evidence is required.  *United States v. Kelley*, 482 F.3d 1047, 1050–51 (9th Cir. 2007), citing *Illinois v. Gates*, 462 U.S. 213, 246 (1983) and *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) *(en banc)*.

The Court has already determined that the information regarding Boudier is not misinformation.  Therefore, that information would not be removed from the affidavit.  The affidavit sets forth the fact that a neighbor called an illegal shooting into 911, and that Boudier identified Dearing, who was standing in front of 4613 Supreme Court, as the person shooting what she believed to be a handgun.  *See* Exhibit 513.  The affidavit further states that Dearing ran inside the residence, causing officers to set up a perimeter and try to get all occupants out.  It says that Dearing and Martinez came out of the residence, and that officers then checked the residence due to the fact that the call was for an illegal shooting and that officers did not know if anyone was inside who may be injured or in need of medical assistance.  The affidavit states that officers entered the residence and conducted a protective sweep, and noticed several firearms, including long rifles and assault rifles with silencers throughout the house.  The affidavit submits that officers found a workshop in the garage used to manufacture silencers and suppressors.  The affidavit states that the premises were frozen until Firearms detectives arrived.  If the Court removes the information regarding all four subjects confirmed as residents of the home and adds the information regarding the Reyes 911 call and the subsequent walkthrough, as Defendant submits, the Court finds that probable cause still exists.  The Supreme Court has declined to articulate a "neat set of legal rules" for evaluating probable cause, *id*. at 232, and instead has instructed magistrate judges to determine probable cause by considering the "totality-of-the-circumstances," *Gates*, 462 U.S. at 230.  In issuing a search warrant, the magistrate judge simply must determine whether there is a "fair probability" that evidence of a crime will be found.  *Id*., 462 U.S. at 238, 246.  In looking at the totality of the circumstances, the Court finds that a fair probability existed that evidence of a crime would be discovered in the residence.  *See Gates*, 462 U.S. at 230-31.  Therefore, the information is not material.

In sum, Defendant has not made a substantial preliminary showing that the affidavit contains

1  material misleading statements and omissions that, if removed or included, would have negated

2  probable cause.   Accordingly, the Court finds that Defendant's request under *Franks* fails.

3      **B.      Motion to Suppress**

4          **1.      Defendant's Arrest**

5      Defendant submits that he was arrested in front of his home without probable cause, in

6  violation of his Fourth Amendment rights.  Docket No. 37 at 8-9.  Defendant relies upon the arrest

7  report which "states simply that after receiving a 911 call, which alleged that shots had been fired

8  on the street, officers observed [Defendant] in front of his house and took him into custody." *Id*. at

9  9.

10     The United States responds that officers arrived at Defendant's residence in response to a

11  shooting call, and observed Defendant outside with two other males.  Docket No. 54 at 11.  Dearing,

12  who appeared to be holding an unknown object, ran inside the residence with the object in his hands.

13  *Id*.  At that time, officers detained Defendant pending investigation.  *Id*.  When Dearing came out

14  of the residence with nothing in his hands and Martinez also came out of the residence, officers

15  properly detained them pending investigation.  *Id*.  Officers entered the premises to conduct a

16  protective sweep and saw in plain view numerous firearms, silencers, firearm parts, and a machine

17  shop. *Id*.  After officers verified that Defendant lived in the residence and did not possess the proper

18  licensure or registration for the weapons in the residence, they had probable cause to arrest him,

19  which they lawfully did.  *Id*. at 11-12.

20     Defendant responds that he was arrested immediately, not detained, and that probable cause

21  did not exist at that time.  Docket No. 58 at 10.  He also submits that he sat in the police vehicle for

22  almost three hours before an officer even spoke with him, thus demonstrating that he was not

23  detained for investigative purposes.  *Id*.  In any event, Defendant submits that officers still needed

24  reasonable suspicion, which they did not have, to detain him.  *Id*.

25     "The Fourth Amendment permits brief investigative stops ... when a law enforcement officer

26  has a particularized and objective basis for suspecting the particular person stopped of criminal

27  activity." *Navarette v. California*, ____ U.S. ____, 134 S.Ct. 1683, 1687(2014) (internal quotation

28  marks omitted).  "Although a mere hunch does not create reasonable suspicion, the level of suspicion

the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id.* (citations and internal quotation marks omitted).  Reasonable suspicion "is dependent upon both the content of information possessed by police and its degree of reliability." *United States v. Edwards*, 761 F.3d 977, 983 (9th Cir. 2014) (internal citation omitted).

An investigatory stop does not violate the Fourth Amendment "if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation omitted).  Determining reasonable suspicion requires considering the totality of the circumstances, and "all relevant factors must be considered in the reasonable suspicion calculus-even those factors that, in a different context, might be entirely innocuous." *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1117 (9th Cir. 2003) (quoting *United States v. Arvizu*, 534 U.S. 266, 277-78 (2002)).  The Ninth Circuit defines reasonable suspicion as "'specific, articulable facts' which together with 'objective and reasonable' inferences, form a basis for suspecting that a particular person is engaged in criminal conduct." *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000) (quoting *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989)).  Reasonable suspicion may depend on an officer's personal experience and special training to make inferences and deductions, as long as the conclusions are reasonable. *United States v. Montero-Camargo*, 208 F.3d 1122, 1131 (9th Cir. 2000) (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

In determining whether and when an investigatory stop becomes an arrest, a court must examine two main components of the detention. *See Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996).  First, the Court must look at "the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted." *Id*. The Court must "review the situation from the perspective of the person seized," and assess whether "a reasonable innocent person in these circumstances would ... have felt free to leave after brief questioning." *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295-96 (9th Cir. 1988). Second, the Court must determine "the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Edwards*, 761 F.3d at

981 (9th Cir. 2014) (internal citations omitted). This inquiry "is undertaken ... from the perspective of law enforcement," bearing in mind that the purpose of investigatory detention is to allow the officer to pursue his investigation without fear of violence. *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009).

Because courts "consider both the inherent danger of the situation and the intrusiveness of the police action ... pointing a weapon at a suspect and handcuffing him, or ordering him to lie on the ground, or placing him in a police car will not *automatically* convert an investigatory stop into an arrest that requires probable cause." *Lambert*, 98 F.3d at 1186 (emphasis in original). The Ninth Circuit has "permitted the use of intrusive means to effect a stop where the police have information that the suspect is currently armed or the stop closely follows a violent crime. Under such circumstances, holding a suspect at gunpoint, requiring him to go to his knees or lie down on the ground, and/or handcuffing him will not amount to an arrest." *Edwards*, 761 F.3d at 982.

The Court finds that the facts of this case show that Defendant was initially detained. Sgt. McKenzie responded to a tone alert of shots fired on the 4600 block of Supreme Court. When he arrived a few minutes later and parked his car, a woman ran up to him, pointed toward 4613 Supreme Court, and excitedly said, "That's them, that's them. There they are." Sgt. McKenzie reasonably assumed that the woman was the one who called 911. He looked where the woman pointed and saw Defendant reaching inside the vehicle in the driveway of the residence. Sgt. McKenzie approached the vehicle, and drew his gun. He saw Defendant leaning into the vehicle, Howard on the walkway by the house where the vehicle was parked, and Dearing at the door of the house.

Sgt. McKenzie was still the only officer on the scene when he made contact with the three males. As he approached, he observed Defendant, who was standing outside the rear driver's side door, reach inside the vehicle, across the seat as if he were picking something up. Sgt. McKenzie could not see Defendant's hands or what he was reaching for at that time. As Sgt. McKenzie approached the residence, he began giving commands to Defendant and the other individuals. He told Defendant to get out of the car and show his hands. Defendant did not immediately comply with Sgt. McKenzie's commands, and Sgt. McKenzie could not tell what Defendant was doing in the

vehicle.  Defendant reached into the vehicle, then turned around toward Sgt. McKenzie and threw something to the ground, then put his hands up.  He then followed Sgt. McKenzie's commands and eventually got onto the ground on his stomach, where he was handcuffed by two officers.  Officers later determined that what Defendant threw was a weapon - an arrow head with threads on it that can be screwed into a broomstick or other object.  Based on the information up to this point, officers clearly had reasonable suspicion to detain Defendant.  *See Edwards*, 761 F.3d at 982-83.

Defendant was detained in the back of a patrol car.  In the meantime, Dearing held an unknown object in his hands, refused to comply with law enforcement commands, and pivoted into the house.  Sgt. McKenzie testified that Dearing's movements were very deliberate and that his movements reminded Sgt. McKenzie of the way officers hold their firearms while at the shooting range.   He believed that Dearing's movements were consistent with holding a firearm, which concerned him.

While Dearing was inside the residence and Defendant was detained for investigatory purposes, Sgt. McKenzie spoke to Defendant numerous times to try to ameliorate the danger.  Defendant claimed to know nothing - he said no one was inside the house, though Dearing clearly was.[21]  He knew nothing about Martinez being inside the house, or about what was behind the locked door upstairs.  Despite the fact that the detention was somewhat intrusive, the Court finds that the inherent danger of the situation justified the officers' actions, and that their actions were reasonable and did not convert Defendant's detention into an arrest.  *See Edwards*, 761 F.3d at 982.

After officers conducted their protective sweep and found all of the rifles, suppressors, silencers and machine shop, and determined that Defendant lived in the residence and did not possess the necessary licenses for the items inside, they had probable cause to arrest him, which they did.  *See Gerstein v. Pugh*, 420 U.S. 103 (1975).

Accordingly, the Court recommends **DENYING** Defendant's motion to suppress his arrest as unlawful.

---

[21]Although Defendant's recorded statement may have started three hours after the original detention, Sgt. McKenzie testified that he went to Defendant repeatedly during the investigation, including the stand-off with Dearing inside the residence, to try to determine who was in the residence and what type of danger existed.

2.       **Protective Sweep and Subsequent Walkthrough**

Defendant submits that the protective sweep violated his Fourth Amendment rights.  Docket No. 37 at 9.  He argues that the only basis for the protective sweep was the nature of the 911 call, which in no way discussed either Defendant or his residence.  *Id*.  Therefore, Defendant submits that the officers did not enter his residence with probable cause or pursuant to an exception to the warrant requirement.  *Id*. at 9-10.  Defendant submits in his supplemental briefing that a protective sweep is appropriate only if officers can articulate specific facts warranting "a reasonably prudent officer in believing the area to be swept harbor[s] an individual posing a danger" to those on scene.  Docket No. 71 at 6.  Defendant contends that such articulable facts do not exist in this case.  *Id*. at 6-8.  Defendant further submits that no evidence exists that the officers "reasonably believe[d] their entry [wa]s necessary to render emergency medical care to a person inside" the residence.  *Id*. at 6.

Defendant additionally contends that the subsequent walkthrough was not an extension of the protective sweep and, rather, was a search for evidence to obtain probable cause for a search warrant.  *Id*. at 9.  He submits that the video shows officers using flashlights to look in "every nook and cranny in the home," and also shows the officers "opening closed containers and moving objects to see what might be concealed behind those objects."  *Id*.  Further, Defendant contends that, as the initial protective sweep was illegal, so too is the subsequent walkthrough.  *Id*.

The United States contends that the protective sweep was lawful, and was based upon exigent circumstances.  Docket No. 54 at 9-10.  The United States further argues that officers would have been allowed to follow Dearing[22] into the residence under the hot pursuit exception and, therefore, the contraband inside the residence would have been inevitably discovered.  *Id*.  As a result, the United States submits, even if the Court finds the protective sweep was not lawful, the evidence should not be suppressed under the inevitable discovery doctrine.  *Id*. at 10.

In its supplemental briefing, the United States submits that the purpose of the walkthrough "was for Sergeant McKenzie to verify LVMPD observations and inform newly arrived Firearms Investigations Unit Detective Kitchen of the relevant items before drafting the affidavit and

[22]The United States erroneously states that Defendant went back into the residence, when the evidence clearly established it was Dearing.

application for a search warrant for the items viewed inside the residence." Docket No. 73 at 2.  The United States contends that numerous illicit items were observed in plain view during the protective sweep, including firearms, suppressors/silencers, narcotics, and a manufacturing workshop for suppressors/silencers.  *Id*.  The United States submits that the body camera footage of the walkthrough demonstrates that the items were found in plain view.  *Id*.  The United States further submits that "[t]estimony at the [evidentiary] hearing also revealed that no illicit items were touched, moved or manipulated" during the walkthrough.  *Id*.  Additionally, the United States argues that the walkthrough, which allowed additional officers to view the interior of the residence prior to the issuance of the search warrant does not prejudice Defendant because the information was already imputed to them under the collective knowledge doctrine.  *Id*. at 4.  Finally, the United States contends that, since probable cause existed for the issuance of the search warrant prior to the walkthrough, even if the Court finds the walkthrough was a violation of Defendant's rights, the exclusionary rule does not apply.  *Id*. at 5.

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)).  Therefore, it is a "'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)).  As the "ultimate touchstone" of the Fourth Amendment is reasonableness, however, "the warrant requirement is subject to certain exceptions." *Brigham City*, 547 U.S. at 403.  *See also Mincey v. Arizona*, 437 U.S. 385, 393-394 (1978) ("warrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment").

There are two general exceptions to the warrant requirement for home searches: exigency and emergency.  Under the exigency doctrine, a warrantless search of a home is permitted if there is

1    probable cause to believe that contraband or evidence of a crime will be found at the premises and

2    that exigent circumstances exist.   *United States v. Lai*, 944 F.2d 1434, 1441 (9th Cir.1991)

3    (abrogated on other grounds). As a general rule, "we define exigent circumstances as those

4    circumstances that would cause a reasonable person to believe that entry ... was necessary to prevent

5    physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the

6    suspect, or some other consequence improperly frustrating legitimate law enforcement efforts."

7    *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005) (internal citation omitted).   The

8    emergency doctrine, on the other hand, "provides that if a police officer, while investigating within

9    the scope necessary to respond to an emergency, discovers evidence of illegal activity, that evidence

10   is admissible even if there was not probable cause to believe that such evidence would have been

11   found."   *United States v. Cervantes*, 219 F.3d 882, 888 (9th Cir.2000).

12        The Ninth Circuit evaluates the reasonableness of a warrantless entry under the totality of the

13   circumstances from the perspective of the police officers at the time of the entry.   *United States v.*

14   *Lindsey*, 877 F.2d 777, 781 (9th Cir. 1989).   The exigency "must be assessed at the point

15   immediately before" entry.   *Arkansas v. Sanders*, 442 U.S. 753, 763 (1979).   Further, an action is

16   "reasonable " under the Fourth Amendment, regardless of the individual officers' state of mind, "as

17   long as the circumstances, viewed objectively, justify [the] action."   *Scott v. United States*, 436 U.S.

18   128, 138 (1978).   "The officer's subjective motivation is irrelevant."   *Brigham City*, 547 U.S. at 404.

19   The critical common denominator in exigent circumstances cases is the need for quick action in an

20   emergency situation.   *United States v. Warner*, 843 F.2d 401, 403 (9th Cir. 1988) (presence of

21   exigent circumstances necessarily implies insufficient time to obtain a warrant).

22        Here, the totality of the circumstances known to officers at the time of the warrantless entry

23   started with a 911 call for shots fired on the 4600 block of Supreme Court.  Upon Sgt. McKenzie's

24   arrival, he was met by a woman who excitedly pointed to Defendant's residence and indicated that

25   the people there (Defendant, Dearing and Howard) were "them," which Sgt. McKenzie to believe

26   that she meant they were the ones involved in the shooting.  Defendant did not immediately respond

27   to commands to show his hands and drop to the ground, and threw a weapon to the ground before

28   complying.  Additionally, Dearing - who was identified as the one with the gun - did not respond to

the officers' commands, was holding something against his chest that appeared to Sgt. McKenzie the way officers hold guns, pivoted into the residence and would not immediately comply with commands to come outside.  Although Defendant told officers that no one other than Dearing was inside the residence, a female left the residence, so officers did not know if more people were inside the residence or if anyone inside was hurt.  Further, Sgt. McKenzie noticed that the walkway to the front door was littered with spent ammunition.  Looking at the totality of the circumstances, the Court finds that law enforcement clearly had objective reason to believe that an exigency existed - in other words, that  entry "was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *See Martinez*, 406 F.3d at 1164.  The Court therefore finds that the protective sweep was objectively reasonable under the exigent circumstances exception.

The walkthrough, while somewhat troubling to the Court, is not a basis for suppression. During the viewing of Sgt. McKenzie's body camera video, the Court noted numerous firearms in plain view, thus demonstrating that probable cause existed prior to the walkthrough.  *See, e.g., Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).  The Court did note one occasion in which Detective Kitchen opened what appeared to be an instrument case; however, he did not appear to touch what was inside, and any violation that occurred from opening that case is mitigated by the numerous weapons and suppressors, as well as the machine shop, in plain view.

In *Murray v. United States*, the Supreme Court (*quoting Nix v. Williams*, 467 U.S. 431, 443 (1984)), described the independent source doctrine as follows:

> The interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred . . . .  When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error of violation.

487 U.S. 533, 537 (1988).  The court held: "So long as a later, lawful seizure is genuinely independent of an earlier, tainted one . . . there is no reason why the independent source doctrine should not apply.  *Id*. at 542.

1    In this instance, the Court finds that, even if the walkthrough was illegal, the protective sweep

2    was an independent lawful source.  Therefore, even if the walkthrough was illegal, the independent

3    source doctrine applies.

4              **3.       Probable Cause for Issuance of First Search Warrant for Residence**

5              Probable cause is "a fluid concept turning on the assessment of probabilities and the

6    particular factual context not readily, or even usefully, reduced to a neat set of legal rules," and its

7    existence must be determined by an analysis of the totality of the circumstances surrounding the

8    intrusion.  *Gates*, 462 U.S. at 232.  Probable cause does not deal with hard certainties, but with

9    probabilities.  *Id*. at 241; *see also Brinegar v. United States*, 338 U.S. 160, 175 (1949) (Probable

10   cause deals with "probabilities" which are not technical, but factual and practical considerations of

11   everyday life on which reasonable and prudent people, not legal technicians act).  As noted above,

12   the Supreme Court defines probable cause to search as "a fair probability that contraband or evidence

13   of a crime will be found in a particular place."  *Gates,* 462 U.S. at 238.  *Gates* makes clear that the

14   determination of probable cause is made by examining the "totality of the circumstances."  *Id*.  The

15   United States Supreme Court has repeatedly emphasized that the probable cause standard is a

16   "practical, non-technical conception."  *Brinegar,* 338 U.S. at 175.

17             The *Gates* decision made it clear that a judge's decision regarding probable cause should be

18   given great deference.  The duty of a reviewing court is to insure that the judge had a substantial

19   basis for concluding that probable cause existed.  A reviewing court is required to examine all

20   circumstances set forth in the affidavit, and in doubtful cases, to give preference to the validity of

21   the warrant.  *United States v. Peacock*, 761 F.2d 1313, 1315 (9th Cir.), *cert. denied*, 474 U.S. 847

22   (1985).

23             It is well recognized that law enforcement officers can rely on their own experience and the

24   experience and information of other law enforcement officers in establishing probable cause.  *United*

25   *States v. Butler*, 74 F.3d 916 (9th Cir. 1996).  Similarly, "a magistrate [judge] may rely on the

26   conclusion of experienced law enforcement officers regarding where evidence of a crime is likely

27   to be found."  *United States v. Fannin*, 817 F.2d 1379, 1381 (9th Cir. 1987).  *See also United States*

28   *v. Ayers*, 924 F.2d 1468, 1479 (9th Cir. 1991) ("in weighing the evidence supporting a request for

1   a search warrant, a magistrate [judge] may rely on the conclusions of experienced law enforcement

2   officers regarding where evidence of a crime is likely to be found.")  An officer need not include *all*

3   of the information in his possession to obtain a search warrant.  An affidavit need only show facts

4   adequate to support the finding of probable cause.  *United States v. Johns*, 948 F.2d 599, 605 (9th

5   Cir. 1991).

6          Reviewing the affidavit as a whole, applying the totality of the circumstances test, and

7   showing the issuing judge great deference as the United States Supreme Court mandates, this court

8   finds that the issuing judge had a substantial basis for concluding that probable cause existed for

9   issuance of the search warrant for Defendant's residence.  As the Supreme Court in *Gates* recognized

10  "only the probability, and not a prima facie showing of criminal activity, is the standard of probable

11  cause." 462 U.S. at 235.  The evidence presented to the issuing judge, taken as a whole, established

12  the probability that evidence of illegal activity would be found in the premises sought to be searched

13  in the at-issue search warrants and the accounts sought to be seized in the at-issue seizure warrants,

14  based on factual and practical considerations of everyday life on which reasonable and prudent

15  people act.  As probable cause existed for the issuance of a search warrant for Defendant's residence,

16  based upon reasonable and legitimate actions by law enforcement prior to the walkthrough, the Court

17  finds that the first search warrant for Defendant's residence was supported by probable cause.

18          **4.      Probable Cause for Issuance of Second Search Warrant for Residence**

19          Defendant submits that the June 10, 2014, search warrant for Defendant's residence was

20  based on Detective Kitchen's prior misstatements and omissions.  Docket No. 37 at 5.  Additionally,

21  Defendant contends that the search warrant is based on the pretext that officers may have left items

22  of evidentiary value at the residence during their original search and that, though the search warrant

23  discusses booby traps, none actually existed in the residence.  *Id*.  Further, the search warrant seeks

24  any human remains, based upon an in-custody statement made by Martinez regarding a conversation

25  she allegedly overheard between Defendant and Dearing.  *Id*. at 5-6.  Defendant submits that

26  Detective Kitchen intentionally failed to inform the issuing judge that Martinez was under heavy

27  sedation, due to the psychiatric medication she received at the jail, at the time she made her

28  statement.  *Id*. at 6.  Therefore, Defendant asks the Court to suppress the second search warrant.

1    The United States responds that the information in the second search warrant affidavit is
2    based upon the investigation conducted by Firearms detectives in the weeks after May 26, 2014.
3    Docket No. 54 at 18-19.   Further, the United States submits that the transcript of Martinez's
4    interview is 60 pages long and demonstrates that she answered questions "responsively, intelligently,
5    and with great detail." *Id.* at 19.  Finally, the United States argues that no additional evidence was
6    recovered during the search of the residence arising out of the second search warrant and, therefore,
7    there is nothing to suppress. *Id.*  The United States asks the Court to deny Defendant's request.

8    In reply, Defendant contends that the United States failed to respond to "virtually all" of the
9    facts he alleged in his motion to suppress regarding the second search warrant.  Docket No. 58 at 4.
10   Defendant submits that the only fact "that appears to be in dispute ... is whether Ms. Martinez was
11   heavily medicated" during the interview. *Id.* at 4-5.  Defendant therefore submits that the Court
12   should assume all other facts he alleged in his motion regarding the second search warrant are true.
13   *Id.* at 5.

14   The audio recording of Martinez's interview was marked as Government Exhibit One and
15   admitted during the evidentiary hearing.   Docket No. 120 at 77.   The Court has now had an
16   opportunity to review that recording.  While Martinez does sound somewhat muted on the recording,
17   she appears to have no difficulty answering questions, and answers some questions with great detail.
18   As the search warrant recovered no evidence at the residence, however, the Court need not make a
19   determination as to whether Martinez was under the influence of any sort of medication.

20   The evidence adduced at the hearing clearly showed that nothing was recovered from the
21   residence as a result of the second search warrant.  Docket No. 119 at 132.  Therefore, the Court
22   finds that Defendant's request to suppress any evidence recovered from the residence is moot.

23   ## ORDER

24   Based on the foregoing and good cause appearing therefore,

25   IT IS HEREBY ORDERED that Defendant's request for relief pursuant to *Franks* is
26   **DENIED**.

27   . . . .

28   . . . .

**RECOMMENDATION**

Based on the foregoing and good cause appearing therefore,

IT IS RECOMMENDED that Defendant's Motion to Suppress, Docket No. 37, be **DENIED**.

**NOTICE**

Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must be in writing and filed with the Clerk of the Court within 14 days of service of this document.** The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This Circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 19th day of October, 2015.

_____
NANCY J. KOPPE
United States Magistrate Judge